IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 8, 2020

## STATE OF TENNESSEE v. TERRY BRADFORD WHITAKER

**Appeal from the Circuit Court for Hardin County**
**No. 16-CR-119     Charles C. McGinley, Judge**

_____

### No. W2019-00583-CCA-R3-CD
_____

The Defendant, Terry Bradford Whitaker, was convicted by a Hardin County Circuit Court jury of premeditated first-degree murder and sentenced to life imprisonment. On appeal, he argues that the trial court erred in denying his motion to suppress DNA evidence and that the evidence is insufficient to sustain his conviction. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

George D. Norton, Jr., Selmer, Tennessee, for the appellant, Terry Bradford Whitaker.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Matthew F. Stowe, District Attorney General; and Vance Dennis and Shelly Morris Deloach, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The Defendant was charged with the premeditated first-degree murder of the victim, Sidney Layne Burks, who was found dead by his mother on May 5, 2016, having been stabbed more than forty times.

**Motion to Suppress**

Before trial, the Defendant filed a motion to suppress blood evidence found in his truck that was uncovered during the execution of an "invalid" search warrant.

At the suppression hearing, Agent Brent Booth of the Tennessee Bureau of Investigation ("TBI") testified that during the course of his investigation, he interviewed witnesses who gave him information that the Defendant had bragged about stabbing the victim. He went to the Defendant's mother's house, and she informed him that the Defendant's truck was "parked, hidden in the yard behind the house . . . for some reason unknown to her." This raised Agent Booth's suspicions, so he asked for and received permission to go look at the truck. Through the closed driver's window, he could see what appeared to be drops of dried blood on the steering wheel, steering column, and the floorboard. Based on his observations, he had other officers stay with the truck while he went to apply for a search warrant.

Agent Booth obtained a search warrant for the Defendant's Ford truck[1] from a McNairy County general sessions judge on May 9, 2016. He had the truck towed to a secure storage facility in Hardin County due to concerns that an impending thunderstorm could remove possible evidence from the truck. The next day, May 10th, Agent Booth realized that there was a typographical error on the last page of the affidavit for the search warrant; specifically, two people in an unrelated case "[t]hat had come off of an old warrant" were mentioned. He went back to the judge to obtain a "replacement warrant." The judge marked "void" on the original warrant and kept it. The truck was in Hardin County at the time the replacement warrant was issued. The warrant was not executed, i.e., the truck was not searched, until it was transported to the crime lab in Shelby County.

**Trial**

Billie Bryan, the victim's mother, testified that the victim lived in a recreational vehicle ("RV") next to her house. She said that she last saw him alive on May 4, 2016, when he came over to her house around 4:00 p.m. to take a bath and eat supper. Mrs. Bryan and her husband left to go to a birthday party around 6:30 p.m. and returned about two hours later. When they returned, she saw a light on inside the RV, but there were no signs of anybody else being there. The next morning, the victim did not come over to eat breakfast at her house like he usually did before going to work. She called him several times on his cell phone, but he did not answer. She went to check on him and found him dead. Mrs. Bryan said that she knew the Defendant because she was friends with his mother and grandmother, but she had never seen him visit her son.

---

[1] Agent Booth also obtained a search warrant for a travel trailer belonging to the Defendant, but the search of the trailer is not discussed in this appeal.

- 2 -

Agent Booth testified concerning his investigation of the victim's homicide. He described the crime scene as "quite bloody." He noted that the victim "had apparently succumbed to numerous stab wounds, and the body was laying inside the motor home with the knees on the floor and the upper torso of the body up on the sofa just as you walk inside the door." Agent Booth did not find a weapon in the home consistent with the wounds he observed.

Agent Booth continued his investigation by interviewing anyone who had been in contact with the victim in the days leading up to his death. On May 9th, he received information that "word had got out in the community that [the Defendant] was the one responsible for this death." Agent Booth was aware that there were active warrants on the Defendant and that "[t]he deputies had picked him up the night before[.]" He went to the Defendant's mother's residence and learned from her that the Defendant lived with his girlfriend, Tina Michelle Ledgewood, in a travel trailer parked in the driveway of her home.

The Defendant's mother directed Agent Booth to a Ford F-150 parked in the backyard that belonged to the Defendant. He looked through the windows of the truck and saw "what looked like blood drops, blood smears, all over the steering column, [and] on the floorboard area[.]" He had the vehicle towed to a secure area at the Hardin County Sheriff's Office due to an impending storm. He obtained a search warrant and had the truck sent to the TBI lab in Memphis.

Agent Booth testified that he located Ms. Ledgewood later the afternoon of the 9th and brought her to the sheriff's office where she gave a sworn statement about the events that took place at the victim's house. Based on what he learned from Ms. Ledgewood, Agent Booth obtained a search warrant for the Defendant's travel trailer. He also learned in his investigation that the Defendant frequented a piece of property adjacent to his mother's property where he grew marijuana and, during a search of the area, Agent Booth found a knife with a deer antler handle in a leather scabbard. It appeared as if the knife had been buried and was only visible because it was next to a large pine tree that had been uprooted by a recent violent thunderstorm. Ms. Ledgewood identified the knife as the one the Defendant carried and that had been used to stab the victim. Agent Booth learned in his investigation that the Defendant "carried a knife most of the time."

Agent Booth testified that he learned that the Defendant and Ms. Ledgewood were at Angela Morgan's residence using methamphetamine prior to going to the victim's house. At Ms. Morgan's, the Defendant "expressed his clenched jaw anger" toward the victim when Ms. Morgan told him that her sister had sustained a severe head injury in a

car accident and that the family blamed the victim for her condition because he delayed taking her to the hospital.

Agent Booth testified that the victim's blood was found on the steering wheel of the Defendant's truck[2] and that the victim "had never been in his truck. They were not friends. They were not associates." A considerable amount of the Defendant's blood was found in various locations inside the truck. The Defendant had injuries on both of his hands when he was arrested.

Medical Examiner Paul Benson conducted the autopsy on the victim. Dr. Benson found forty stabs wounds on the victim's body, five of which hit organs that were lethal to hit and could have individually caused the victim's death. The thirty-five other wounds to various parts of the victim's body, although not fatal, would have increased the victim's bleeding and contributed to his death. Some of the wounds on the victim's hands and feet were consistent with defensive-type injuries. Dr. Benson examined the knife recovered by Agent Booth and surmised that the victim's "injuries would be consistent with a knife like that." There was alcohol and methamphetamine present in the victim's system at the time of his death, as well as low levels of a drug used to treat opiate withdrawal. The level of methamphetamine indicated that the victim used it in the last hours of his life. However, the toxicology findings did not contribute to the victim's cause of death.

Angela Morgan testified that she knew the victim because he was acquainted with her sister, and she personally knew the Defendant. Around 3:00 p.m. on May 4, 2016, the Defendant and his girlfriend, Ms. Ledgewood, came to her house to visit and the three of them used methamphetamine while they were there. Ms. Morgan had a discussion with the Defendant about her sister after he asked how she was doing. Ms. Morgan told him that her sister was bedridden in a nursing home because of a traumatic brain injury and explained that the victim was involved. She said that her family believed that the victim caused her sister's car to run off the road by hitting her bumper and then got her out of the car and rode around with her for almost two hours before taking her home where someone called an ambulance. The delay in treatment deprived her brain of oxygen and caused damage to the brain. The accident happened four or five years earlier. After hearing about Ms. Morgan's sister, the Defendant made a statement that karma could take care of the situation, that the victim "may have to die in a housefire, karma's a bitch."

Ms. Morgan testified that the Defendant and Ms. Ledgewood left her house after staying a few hours, and she did not see them again that day. The next day, the

---

[2] The TBI forensic lab reports were admitted, by stipulation, through the testimony of Agent Booth.

Defendant called and told her not to tell anyone that he had been at her house, which was about five minutes away from the victim's residence. The Defendant also repeated the remarks he had made the day before about karma. On cross-examination, Ms. Morgan said that she did not take the Defendant's statement to mean that he was going to kill the victim.

Tina Michelle Ledgewood, who was presently incarcerated in the McNairy County Jail on a misdemeanor sentence, testified that she was living with the Defendant in his motor home on his mother's property during the time period at issue. On the evening of May 4, 2016, she and the Defendant went to visit Ms. Morgan. Ms. Morgan gave her yard plants, and the three of them used methamphetamine. They stayed for about an hour and a half, leaving just when it was getting dark. She said that she did not hear any conversations between the Defendant and Ms. Morgan about the victim, explaining that she "was all over the yard looking at flowers."

Ms. Ledgewood testified that when they left Ms. Morgan's house, the Defendant made an unplanned stop at the victim's residence. They were riding in the Defendant's Ford F-150 truck. Ms. Ledgewood did not know why they stopped at the victim's; she assumed they "were just going to stop by and say hey and go on." They went inside, and the three of them sat on the couch. Ms. Ledgewood recalled that after about ten minutes, the Defendant "start[ed] talking sh*t about [her] pu**y, how tight and hot and everything it is." She said that the Defendant talked like that "a lot" when "he got messed up" or was around other men. (186) Ms. Ledgewood thought the victim took the conversation seriously because he forcefully grabbed her crotch while saying, "Won't you let me try some of that?" She told the victim to stop, and "then [the Defendant] just grabbed him by the collar and start[ed] stabbing him." Ms. Ledgewood ran out the door while screaming for the Defendant to stop. She said that the victim was screaming for him to stop, too. It ended when the Defendant "slit his throat." Asked if she was looking when it happened, Ms. Ledgewood said, "I seen it all, man."

Ms. Ledgewood testified that she and the Defendant got into his truck and drove home. The Defendant took off his clothes and carried them into his mother's house and put them in the washer. Ms. Ledgewood said that she recognized the knife the Defendant used to stab the victim because he carried it "every day." The last time she saw the knife, the Defendant had "put it in . . . one of those tubs with a lid and took it to the woods" behind his mother's house.

On cross-examination, Ms. Ledgewood stated that the victim invited her and the Defendant into his home and that the victim and the Defendant knew each other. The Defendant had said nothing to her about planning to kill the victim, and it seemed like a social visit. She said the victim's words toward her and the act of grabbing her crotch

made her "feel like sh*t" and seemed to infuriate the Defendant. She agreed that it would be normal for someone to act irrationally if their girlfriend were treated in such a manner. She said that the Defendant reacted immediately to the victim's grabbing, without delay. She admitted that in a statement to police she said that "the adrenaline was flowing," and the Defendant "just couldn't stop[.]" Given the Defendant's history of making lewd sexual comments about her in front of other men, it did not seem to Ms. Ledgewood that the Defendant did so to setup the victim.

The jury convicted the Defendant as charged of first-degree premeditated murder and, after a sentencing hearing, he was sentenced to life imprisonment.

## ANALYSIS

### I. Motion to Suppress

The Defendant argues that the trial court erred in denying his motion to suppress DNA evidence found in his truck because the general sessions judge did not have "geographical jurisdiction over the truck" to issue a valid search warrant. He elaborates that his truck was located in Hardin County when the McNairy County general sessions judge issued the replacement warrant and, therefore, the warrant was void under our supreme court's decision in State v. Frazier, 558 S.W.3d 145 (Tenn. 2018).

We provide this summary of the relevant facts. Agent Booth was investigating a homicide that occurred in Hardin County in the 24th Judicial District. During the course of his investigation, he went to the Defendant's mother's residence in McNairy County in the 25th Judicial District. Agent Booth learned from the Defendant's mother that the Defendant had parked his truck "hidden in the yard behind the house . . . for some reason unknown to her." He received permission from her to view the truck and, through the closed window, saw what appeared to be blood on the steering wheel and floorboard. Agent Booth had other officers stay with the truck while he obtained a search warrant from a McNairy County general sessions judge. He then had the truck towed to a secure location at the sheriff's office in Hardin County due to impending bad weather.

The next day, Agent Booth noticed that there was a typographical error on the last page of the affidavit for the search warrant; specifically, the final sentence named two people in an unrelated case "[t]hat had come off of an old warrant." He drafted a new affidavit that omitted the erroneous information and went back to the McNairy County judge to obtain a "replacement warrant." The judge wrote "void" on the original warrant and signed the new one. The new search warrant was identical to the original one with the exception of the deleted final sentence. The truck was in Hardin County at the time

- 6 -

the replacement warrant was issued. It was not searched until it was transported to the crime lab in Shelby County.

In ruling on the Defendant's motion to suppress the DNA evidence found in his truck as being discovered during the execution of an "invalid" search warrant, the trial court found as follows:

> All right. The motion to suppress be overruled by the Court. You get into some complex things. I originally thought, well, it needed to have been searched in McNairy County and then I thought the number of search warrants that I've issued where in fact it was searched in Davidson County or Shelby County.
>
> So, you don't have to obtain a search warrant where it is to be searched. It was simply brought to Hardin County for safekeeping until it could be transported for the eventual search.
>
> The Court finds first of all, plain view applies in this particular case. He could have actually searched that vehicle over there in McNairy County based upon what he saw and exigent circumstances.
>
> Once it comes here, it's less exigent because it's secured in the sally port, but the Court finds that the plain view exception would apply.
>
> Nevertheless, I find that the search warrant, the corrected search warrant, was validly executed. It was simply done when he discovered a clerical error and a good faith exception would apply in this case for the issuance of that search warrant and to argue otherwise would have meant he would have needed to come to . . . me to search it here. Once the original vehicle was found, it was properly executed in the county where it was, and they simply discovered a clerical . . . error that the officer corrected and completely done in good faith.
>
> So, the motion to suppress is hereby overruled by the Court.

When this court reviews a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d

861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

"A search warrant can only be issued on probable cause, supported by affidavit, naming or describing the person, and particularly describing the property, and the place to be searched." Tenn. Code Ann. § 40-6-103. "A magistrate with jurisdiction in the county where the property sought is located may issue a search warrant authorized by this rule." Tenn. R. Crim. P. 41(a). General sessions judges are included in the definition of magistrates. Tenn. Code Ann. § 40-1-106.

In Frazier, 558 S.W.3d at 146, the Tennessee Supreme Court held that "in the absence of interchange, designation, appointment, or other lawful means, a circuit court judge in Tennessee lacks jurisdiction to issue search warrants for property located outside the judge's statutorily assigned judicial district." Id.[3] As such, the Defendant argues that the McNairy County general sessions judge lacked jurisdiction to reissue the warrant because his truck was no longer located in the judge's judicial district.

This case presents an interesting scenario because the general sessions judge had jurisdiction to issue the original warrant and, had a replacement warrant not been obtained, we would have likely determined that the original warrant was still valid because it only contained an unintentional clerical error that in no way prejudiced the Defendant. See State v. Daniel, 552 S.W.3d 832, 839-41 (Tenn. 2018); see also Collins v. State, 199 S.W.2d 96, 97 (Tenn. 1947). However, the general sessions judge voided the original warrant and issued a replacement warrant at a time when the subject of the search had been transported to a county outside the judge's jurisdiction, which makes the matter less clear.

In any event, we need not belabor the validity of the search warrant because the Defendant's vehicle could have been seized and searched without a warrant. The "automobile exception" to the Fourth Amendment warrant requirement was most recently addressed by our supreme court in State v. Saine, 297 S.W.3d 199, 207 (Tenn. 2009), as follows:

---

[3] We note that the Legislature recently added a second sentence to Tennessee Code Annotated section 40-1-106, which stated: "The judges of chancery and circuit courts have statewide jurisdiction to issue search warrants pursuant to chapter 6, part 1 of this title in any district." See 2019 Pub. Acts, c. 486, § 14, eff. July 1, 2019. However, this enactment has no bearing on this case as the judge who issued the warrant was a general sessions judge, not a chancery or circuit court judge.

The "automobile exception" to the warrant requirement permits an officer to search an automobile if the officer has probable cause to believe that the automobile contains contraband. Carroll v. United States, 267 U.S. 132, 149, 45 S. Ct. 280, 69 L. Ed. 543 (1925). The rationale for the automobile exception is two-fold. Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996); California v. Carney, 471 U.S. 386, 392-93, 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985). First, it is often impractical for officers to obtain search warrants in light of the inherent mobility of automobiles. Carney, 471 U.S. at 393. Second, individuals have a reduced expectation of privacy in their automobiles. Id.

"[T]he automobile exception does not require a separate finding of exigency under the Tennessee Constitution." Id. (citing Maryland v. Dyson, 527 U.S. 465, 466-67 (1999)).

Here, Agent Booth was investigating a very bloody homicide and received information that the Defendant had made threats and bragged about stabbing the victim. Agent Booth was lawfully on the Defendant's mother's property when, looking through a window, he observed apparent blood on the interior of the Defendant's truck, giving him probable cause that he was viewing evidence of the crime. Affording the State the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence, we affirm the denial of the motion.

## II. Sufficiency

The Defendant also argues that the evidence is insufficient to sustain his conviction. He specifically asserts that "the case was established, at best, by circumstantial evidence" and that proof of premeditation was "extremely meager."

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all

conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).

First-degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is defined in our criminal code as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order

to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our courts have come up with a non-exhaustive list of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

In the light most favorable to the State, there is sufficient evidence for a rational trier of fact to determine that the Defendant killed the victim after the exercise of reflection and judgment. The evidence shows that the Defendant was angry with the victim after learning that a friend, Angela Morgan, blamed the victim for her sister's permanent brain injury, and he stated that the victim "may have to die in a housefire, karma's a bi***." Shortly thereafter, the Defendant made an unplanned stop by the victim's house with his girlfriend, Tina Michelle Ledgewood, having never visited the victim's house before. At the victim's house, the Defendant made lewd sexual comments about his own girlfriend in what could reasonably be inferred as an attempt to bait the victim. In response to the Defendant's lewd comments, the victim grabbed Ms. Ledgewood's crotch and said, "Won't you let me try some of that?" Ms. Ledgewood told the victim to stop, but the Defendant immediately grabbed the victim by his collar and began repeatedly stabbing him with a knife he always carried. Ms. Ledgewood recalled that both she and the victim pled with the Defendant to stop, but he continued stabbing the victim for several minutes before finally slitting his throat. The autopsy revealed that the victim had forty stab wounds, five of which were lethal, and including many defensive wounds. After the killing, the Defendant drove himself and Ms. Ledgewood to their home, where he washed his clothes and disposed of the knife in the woods. The following day, the Defendant called Ms. Morgan and asked her not to tell anyone that he had been at her house, which was about five minutes away from the victim's residence,

and also repeated the remarks he had made the day before about karma. This evidence is sufficient to sustain the Defendant's conviction for premeditated first-degree murder.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE